## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-571** |
| **WILLIAM WALLACE WILSON** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-573** |
| **ANDY DURIS** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-580** |
| **JAMES SWAN** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-582** |
| **MICHAEL PATTERSON** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-583** |
| **VICTOR PHILLIP** | : | |

## O R D E R

AND NOW, this        day of                       , 2012, upon consideration of the defendants' Motions Pursuant to Title 18, United States Code, Section 3607, and the government's opposition thereto, it is hereby

1

O R D E R E D

that the defendants' motion are DENIED.

**BY THE COURT:**

_____

**HONORABLE TIMOTHY R. RICE**
***United States Magistrate Judge***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-571** |
| **WILLIAM WALLACE WILSON** | : | |

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-573** |
| **ANDY DURIS** | : | |

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-580** |
| **JAMES SWAN** | : | |

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-582** |
| **MICHAEL PATTERSON** | : | |

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **Criminal No.  11-583** |
| **VICTOR PHILLIP** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SPECIAL PROBATION PURSUANT TO
TITLE 18, UNITED STATES CODE, SECTION 3607**

It comes now that the defendants in the above-captioned cases have moved this

Court to grant them "Special Probation" pursuant to Title 18, United States Code, Section 3607.

For the foregoing reasons, the United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Faithe Moore Taylor and Ashley K. Lunkenheimer, Assistant United States Attorneys for the District, respectfully objects to the defendants motions and requests that they be denied.

### The Discretion Afforded to the Court under Section 3607

Title 18, United States Code, Section 3607 (Special Probation and Expungement Procedures for Drug Possessors) provides in relevant part:

(a) Pre-judgment probation.--If a person found guilty of an offense described in section 404 of the Controlled Substances Act (21 U.S.C. 844)—

(1) has not, prior to the commission of such offense, been convicted of violating a Federal or State law relating to controlled substances; and

(2) has not previously been the subject of a disposition under this subsection; the court may, with the consent of such person, place him on probation for a term of not more than one year without entering a judgment of conviction. At any time before the expiration of the term of probation, if the person has not violated a condition of his probation, the court may, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation. At the expiration of the term of probation, if the person has not violated a condition of his probation, the court shall, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation. If the person violates a condition of his probation, the court shall proceed in accordance with the provisions of section 3565.[1]

(b) Record of disposition.--A nonpublic record of a disposition under subsection (a) . . . , shall be retained by the Department of Justice solely for the purpose of use by the courts in determining in any subsequent proceeding whether a person qualifies for the disposition provided in subsection (a) . . . . A disposition under subsection (a) . . . , shall not be considered a conviction for the purpose of a disqualification or a disability imposed by law upon conviction of a crime, or for any other purpose.

18 U.S.C. § 3607.

---

[1] This provision addresses the Court's discretion to continue or to revoke probation and resentence a defendant after a violation of probation conditions except in certain circumstances where revocation is mandatory.

The legislative history of Section 3607 is sparse and does not provide guidance for its application; the entire legislative history is as follows:

> "Section 2607[sic]. Special Probation and Expungement Procedures for Drug Possessors
>
> Proposed 18 U.S.C. 3607 carries forward the provisions of 21 U.S.C. 844(b) relating to special probation without entry of judgment for first offenders found guilty of violating section 404 of the Controlled Substances Act (21 U.S.C. 844) if there has been no previous conviction of an offense under a federal or state law relating to controlled substances. The section also permits expungement of records for persons placed on probation under the section if they were under the age of twenty-one at the time of the offense and did not violate a condition of probation."

S. Rep. 98-225, P.l. 98-473, Continuing Appropriations, 1985 - Comprehensive Crime Control Act of Senate Report No. 98-225.

Case law is equally sparse, and mostly concerns the effect of this provision in the immigration/deportation context or in cases in which a defendant is convicted of distributing a small amount of marijuana for no remuneration, neither of which is the context here. In fact, other than the statutory eligibility requirements that a defendant "be found guilty of an offense described in section 404 of the Controlled Substances Act (21 U.S.C. 844)," not have a prior conviction under "Federal or State law relating to controlled substances," and not have previously been the subject of a disposition under the section, there is little guidance to be found anywhere to assist a court in deciding whether to apply Section 3607.

There is case law, however, which clearly holds that a court is not required to grant pre-judgment probation under Section 3607 even if a defendant qualifies for it and requests it. See United States v. Gonzalez, 365 F.3d 796, 798 n.1 (9th Cir.2004) ("Like a decision not to depart downward, a district court's special probation decision is discretionary and—barring error as specified under § 3742(a)—is generally not reviewable on appeal. See 18 U.S.C. § 3607

(providing that the court " *may* ... place [a defendant] on probation," not that it must ) (emphasis added)"). In Gonzalez, the defendant was convicted after trial of purchasing at least fifty-two grams of pure methamphetamine. The issue at trial was whether the defendant intended to sell the methamphetamine or purchased it for personal use. The jury convicted Gonzalez of simple possession of methamphetamine, and Gonzalez moved for pre-judgment probation under Section 3607. The district court denied the motion, finding by a preponderance of the evidence that the defendant intended to sell the methamphetamine and reasoning that:

> All of the circumstances of this case indicate that <u>the defendant was in fact engaged in conduct serious and detrimental to community safety</u>. It is the Court's belief that the proper exercise of discretion requires that the Court hold the defendant accountable.

Gonzalez, 365 F.3d at 797 (emphasis added). The Ninth Circuit affirmed the district court's denial.[2]

---

[2] A thorough search of federal cases nationwide resulted in government counsel locating only one case that relates to the application of Section 3607 in a similar context; that case -- <u>United States v. Castro</u>, 2012 WL 1174677 (S.D.N.Y. April 9, 2012) (slip opinion) – is distinguishable. In <u>Castro</u>, the court found the circumstances of the offense to be as follows: The defendant had recently lost her job; her grandmother was in a hospital in the Dominican Republic and needed money for medical care; to earn money, Castro agreed to find some oxycodone for an individual who turned out to be a government informant; Castro engaged in two hand-to-hand sales, and, in total, Castro sold the cooperating witness 110 pills; Castro reported that the government informant berated Castro for not being able to provide more pills; following the second sale, Castro became uncomfortable with continuing her illegal conduct, so she stopped answering the informant's phone calls; and in total, Castro had made $250 for the two sales. <u>Castro</u>, 2012 WL 1174677, at *2. In sentencing Castro, the court examined the need under the factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," and found Section 3607 relief appropriate. The court explained: "Castro's offense consists of two hand-to-hand sales of 110 pills of oxycodone. [Castro], who did not conspire to obtain these pills illegally from a doctor's office or obtain them via violent means, sold the drugs to a government informant, who turned the pills over to the authorities such, the impact of Castro's offense in the community is minimal. In addition, Castro stopped her unlawful conduct before any law enforcement intervention or knowledge of possible arrest. Today, Castro is holding a job and is enrolled in GED training classes. She has no criminal history." <u>Id.</u> The defendants here, unlike Castro, had high-paying jobs; engaged in years of drug activity including using and abusing drugs at work and often "sharing" pills with each other; did not voluntarily remove themselves from the illegal activity even when confidential opportunities were available for them to do so without risking their jobs; and had, by their crimes, a potentially incredible impact on the

As the determination of whether to grant Section 3607 relief is a sentencing issue, the Court is also required to give thorough consideration of all of the sentencing factors set forth in Title 18, United States Code, Section 3553(a), including (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[3]

The defendants essentially would have this Court believe that the nature of the offenses here – the participation by skilled workers in an open-air prescription drug market at a facility whose sole purpose is to create aircraft actively used in military combat –merits the application of Section 3607 because they were simply addicts who hurt only themselves by their crimes. The government's hope is that this memorandum will dispel that notion.

---

community.

[3] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

**Oxycodone and Fentanyl**

Each of the defendants captioned above has been found guilty of attempting to purchase oxycodone tablets and/or fentanyl lollipops on The Boeing Company's Ridley Park, PA campus (with the exception of George Torres, who was suspended from Boeing for drug-related issues at the time of the reverse sales operation and made his attempted purchase off of the campus). "Oxycodone is a semisynthetic opiate manufactured by modifying the chemical thebaine, an organic chemical found in opium.[4] It is the active ingredient in a number of commonly prescribed pain relief medications, including Percocet and OxyContin, that come in a variety of dose strengths.[5] The "[i]ntended use of OxyContin is for long-term relief (up to 12 hours) of moderate to severe pain associated with conditions such as cancer and arthritis."[6] Currently all of the products containing oxycodone are classified by the Drug Enforcement Administration as Schedule II controlled substances.[7]

Oxycodone's chemical structure is similar to codeine and is almost a potent as morphine in its ability to produce opiate-like effects, including euphoria.[8] It works through the central nervous system by altering the user's sense of pain and his or her emotional response to pain, but like other narcotic medications, can impair certain daily activities, including driving and other mental and physical abilities.[9] These side effects – including breathing irregularity or respiratory depression; increased pressure of cerebral and spinal fluid; headaches; nausea; dizziness; seizures; heart failure; and low blood pressure  -- are usually mild, but there are more

---

[4] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp
[5] Id.
[6] Id.
[7] Id.
[8] Id.; http://www.teenoverthecounter drugabuse.com/oxycodone.html.
[9] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

serious complications and negative effects from using products containing oxycodone, particularly when abused.[10]

When oxycodone products are used consistent with a doctor's care, signs of addiction can be monitored and controlled more effectively than when used outside of a doctor's care.[11] Accordingly, "when used illicitly, the chances of becoming addicted to it increase exponentially."[12] In part, this is caused by the fact that oxycodone has "many similarities to other drugs of abuse including alcohol, heroin, and marijuana, in that they elevate levels of dopamine, the neurotransmitter linked with pleasure experiences. As a result, prolonged use and abuse of oxycodone medications eventually changes the brain in such a way that a user cannot quit on his or her own, a typical sign of addiction."[13] "Drugs that cause similar effects to oxycodone include: opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine."[14] The potential for withdrawal symptoms when using prescription opioids (e.g., oxycodone) is extremely high, especially when the user stops suddenly, and may include severe symptoms such as anxiety, nausea, insomnia, muscle pain, fevers, and other flu like symptoms.[15]

"Fentanyl is 100 times more potent than morphine as an analgesic," and is extensively used for anesthesia and analgesia but is also used for chronic pain management.[16] Actiq, the type of fentanyl product at issue here, is a "solid formulation of fentanyl citrate on a

---

[10] Id.
[11] Id.
[12] Id.
[13] Id.
[14] http://www.justice.gov/dea/pubs/abuse/drug_data_sheets/Oxycodone.pdf
[15] Id.
[16] http://www.deadiversion.usdoj.gov/drugs_concern/fentanyl.pdf;
http://www.justice.gov/dea/concern/fentanyl.html

stick that dissolves slowly in the mouth for transmucosal absorption.[17] "It is intended for opiate-tolerant individuals and is effective in treating breakthrough pain in cancer patients."[18]

"[Fentanyl] is similar to other opioids like morphine or oxycodone in its pharmacological effects and produces analgesia, sedation, respiratory depression, nausea, and vomiting.[19] It also appears to produce muscle rigidity with greater frequency than other opioids.[20] The biological effects are indistinguishable from those of heroin, with the exception that fentanyls may be hundreds of times more potent."[21]

Like oxycodone, fentanyl is classified as a schedule II substance and is abused for its intense euphoric effects.[22] "Fentanyl can serve as a direct substitute for heroin in opioid dependent individuals," but is a very dangerous substitute for heroin because it is much more potent than heroin and results in frequent overdoses that can lead to respiratory depression and death."[23]

### 1.     Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[24] Prescription drugs hook the

---

[17] http://www.justice.gov/dea/concern/fentanyl.html
[18] Id.
[19] Id.
[20] Id.
[21] Id.
[22] http://www.justice.gov/dea/concern/fentanyl.html
[23] Id.
[24] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

poor and the rich, the old and the young, the black and the white.[25] It is an epidemic.[26] Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[27] And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[28]

        In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller. While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold misery and harm. The White House drug policy office estimates that such abuse rose seventeen percent from 2001 to 2005. That office reports that currently there are more new abusers of prescription drugs than new users of any illicit drugs. As recently reported, "Young people mistakenly believe prescription drugs are safer than street drugs . . . but accidental prescription drug deaths are rising and students who abuse pills are more likely to drive fast, binge-drink and engage in other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of prescription drug abuse").

---

[25] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[26] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[27] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[28] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

In the Eastern District of Pennsylvania, prescription drug abuse is quite significant as well.[29] Local clinics have stated that "drug addiction in both Philadelphia and New Jersey is almost legendary due to its severity. Heroin and opioid-based prescription medication are two the top drugs abused in these areas. More than four percent of those surveyed in both the Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug dealers."[30] State legislators in Pennsylvania have been trying to address this growing problem.[31]

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[32] The general public – which the Court takes into consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse. According to a recent poll:

40 percent say prescription pills are "much safer" than illegal drugs.

31 percent say there is "nothing wrong" with prescription drug use.

29 percent think prescription painkillers are non-addictive.[33]

---

[29] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis, June 2007, available at http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[30] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[31] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican Communications, May 3, 2004, available at http://www.pasenategop.com/news/ archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud and abuse are becoming a serious problem in Pennsylvania and other states, and stricter guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

[32] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

[33] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[34] This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[35]

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[36] It is a "significant threat" in the United States.[37] Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[38] The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

Accordingly, the government respectfully requests that this Court take into consideration when deciding whether to grant Section 3607 relief to these defendants the general context in which their criminal conduct arose.

---

[34] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[35] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

[36] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[37] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[38] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

2. **Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society**

In considering whether to grant the defendants' Section 3607 relief, the Court should also take into consideration the specific context in which these cases arose. The defendants in these cases are all skilled workers whose employment at The Boeing Company provided them with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[39] Here, the defendants salaries at the time of their arrests ranged from $41,900 to $75,483 without accounting for overtime pay. And unlike junkies and drug dealers on the street, the defendants had options. The Boeing Company's medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment.

Furthermore, what must be considered in determining whether Section 3607 relief should be granted is not just the salary, medical benefits and treatment options that the defendants were offered by virtue of their employment, but also the extremely sensitive nature of their work – work they performed while using and abusing opioids.

The Boeing Company Ridley Park facility produces the CH-47 Chinook and portions of the V-22 Osprey. "The Chinook is a multi-mission, heavy-lift transport helicopter. Its primary mission is to move troops, artillery, ammunition, fuel, water, barrier materials, supplies and equipment on the battlefield. Its secondary missions include medical evacuation, disaster relief, search and rescue, aircraft recovery, fire fighting, parachute drops, heavy construction and

---

[39] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

civil development."[40] Chinooks are currently in use by the U.S. Army, U.S. Army Reserve and

National Guard, and International armed forces.[41] It has had wide use in Operation Enduring

Freedom in Afghanistan and Operation Iraqi Freedom in Iraq, including use in air assault

missions, inserting troops into fire bases and later bringing food, water, and ammunition.[42]  It

was particularly useful in the mountainous terrain of Afghanistan where high altitudes and

temperatures limited the use of the Black Hawk.[43]

       The V-22 Osprey is the first aircraft designed from the ground up to meet the

needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops,

20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and

vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and

rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations

Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard

an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-

to-air refueling capability, the cornerstone of the ability to self-deploy."[44] As a result, "more than

165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force

Special Operations Command Osprey squadrons. The two services have together logged 16

successful combat, humanitarian, ship-based or Special Operations deployments since 2007. The

worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those

hours logged in the past two years."[45]

---

[40] http://www.boeing.com/rotorcraft/military/ch47d/.
[41] http://www.boeing.com/rotorcraft/military/ch47d/docs/CH-47D_overview.pdf
[42] http://www.armedforces-int.com/projects/boeing_ch_47_chinook.html
[43] Id.
[44] http://www.boeing.com/rotorcraft/military/v22/
[45] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

Each of the defendants in this case worked on the production of the Chinook, the V-22 Osprey, or both.  Most of the defendants (including Andy Duris; Vincent Demsky; Victor Phillip; William Summers; and James Swan) are composite fabricators, which means generally that they fabricate aircraft composite parts and rotor blades. Two of the defendants – Michael Homer and Michael Patterson served as inspectors, and the rest were involved in various jobs necessary to the manufacture of the Chinook and V-22 Osprey at the Ridley Park Boeing plant.

The consequences of any undetected errors made in any of the defendants' jobs cannot be understated. Aside from the fact that most of the defendants were involved in the use of large, heavy machinery in performing their jobs, which put anyone around them in danger when they were impaired, any errors that affected the performance of completed Chinook or V-22 Osprey could prove disastrous, as experience has shown. For example, in May 2011, the Australian Army grounded its fleet of Chinook helicopters after one of the large troop-carrying aircraft crashed in Afghanistan, killing an army pilot.[46] There is no indication that the cause of the crash had anything to do with substance abuse by employees at Boeing's Ridley Park facility, but the story is illustrative of the exponential effect that a problem with a single Chinook or V-22 Osprey could have on military operations: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet. In fact, the United States military has also grounded its Chinook and V-22 Osprey fleets when accidents have happened. For example, the United States Army grounded its 466 Chinook' troop helicopters in August 1999 and advised other militaries to halt flights worldwide after a crack was found in an engine gear of a British Chinook helicopter; the United States Marine Corps grounded its fleet of V-22

---

[46] http://www.theaustralian.com.au/national-affairs/defence/chinook-fleet-grounded-as-fatal-afghan-crash-investigated/story-e6frg8yo-1226159681671.  The cause of the crash may never be known because the flight recorders were destroyed by a missile soon after the accident. http://www.dailytelegraph.com.au/news/cause-of-a-helicopter-crash-in-afghanistan-that-killed-army-pilot-lieutenant-marcus-case-may-never-be-known/story-e6freuy9-1226397995791

Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[47]

### 3.    Analysis of Individual Defendant's Backgrounds Requires Denial of Their Application for Relief Pursuant to Section 3607

### A. Michael Patterson

Michael Patterson began his employment at Boeing in 1985. His employment history is summarized as follows:

>           1985 - 1988 - machinist
>           1988 - 2000 - janitor, machinist
>           2000 - 2008 - tool, template worker
>           2008 - 2011 - inspector in operational support

Patterson, like every other defendant in this matter, signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company. He also agreed to inform the company if he was arrested or charged with any criminal offenses.

Patterson should be deemed ineligible for relief under section 3607 because he previously received diversion for a June 23, 1992 summons for marijuana possession. That summons was dismissed on April 22, 1993 after Patterson completed a six month diversion program. The statute, while not expressly excluding defendants who have received this relief in state or local courts, does prohibit a second bite of the apple to those who have received diversion in federal courts. The government urges this Court to adopt the spirit and intent of the statute and deny relief to all defendants who, like Patterson, have already been given a second chance and have failed to take advantage of it.

---

[47] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

The Court should also exercise its discretion and deny Patterson's application for relief due to non statutory factors. The tapes and transcripts depicting Patterson's purchases from cooperators reveal some disturbing facts. On September 9, 2011, Patterson discusses his cocaine distribution activities and informs our cooperator that he expects to have cocaine for sale next week. On September 23, 2011, Patterson uses the fentanyl lollipop immediately after purchasing it. In addition, a post arrest search of Patterson resulted in the recovery of three round green tablets marked "80" on one side and "OP" on the other. These pills were submitted to the lab and were determined to be oxycodone. Lastly, Patterson served as the President of the UAW Union at the Boeing Plant from March 12, 2010 until January 3, 2011. As both an Inspector and the Union President, Patterson was in a position of leadership and authority at this plant. His abuse of his responsibilities as the highest ranking union official and as a quality insurance guarantor contributed not only to the acceptability of this drug culture but significantly increased the likelihood of the continuity of the culture as well as the danger to the military end users of the aircraft manufactured at Boeing.

### B. James Swan

James Swan began his employment at Boeing in 2009. He has been a composite fabricator the entire time. Swan also signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.

Swan should also be deemed ineligible for relief under section 3607 because he previously received ARD in Delaware County as a result of a 2009 arrest for striking a parked car while driving under the influence of alcohol. Swan entered this diversion program on February 18, 2009 and completed it on February 19, 2010. In addition, during his meeting with

the government Swan admitted to distributing oxycodone on a few occasions to George Torres, Ryan Vandruff, and Victor Phillip. Distributors are statutorily prohibited from relief pursuant to 3607.

The Court should also exercise its discretion and deny Swan's application for relief due to non statutory factors. The tapes and transcripts depicting Swan's purchases from a cooperator reveals the depth of his addiction. He approaches our cooperator three times during the same day purchasing additional drugs because they have not had the intended effect on him. During that time he initially purchases two oxycodone tablets, then later returns to complain that he does not feel anything and purchases a fentanyl lollipop. When that fails to get him high, he returns a third time to discuss the fentanyl and to purchase more oxycodone. He also informs his "supplier" that he saw a manager confronting another "high" worker at the plant. Swan's disciplinary files show two violations. The first occurred on October 11, 2010 where he received a written warning for failing to comply with regulations which caused a work delay. The second occurred on February 14, 2011 and involved a written warning for unsatisfactory attendance.

## C. Andy Duris

Andy Duris began his employment at Boeing in 1980. He was a learner blade builder from 1980 until 1983.  In 1982 Duris was terminated by Boeing for falsifying company time records. That termination lasted 21 days. In 1983 he became a composite fabricator and remained in that position until 2011. Duris signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.

The Court should also exercise its discretion and deny Duris' application for relief due to non statutory factors. Duris' disciplinary files show one violation after his return to

19

Boeing after the 1982 termination . Duris received a day off without pay for "leaving a full piece of backing in a lay-up" in 2007.

### D. William Wilson

William Wilson began his employment at Boeing in 1986. His employment history is summarized as follows:

1986 - 1989 - storekeeper, central dispatcher
1990 - 1991 - router operator
1991 - 1995 - automotive equipment operator
1995 - 2011 -construction equipment operator

Wilson also signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.

Wilson should also be deemed ineligible for relief under section 3607 because the tape and transcript depicting Wilson's purchase from a cooperator reveals his role as a supplier as well as a user. He informs our cooperator that he should be getting his prescription for percocet and xanax tablets and offers to sell them to him. Distributors are statutorily prohibited from relief pursuant to 3607.

The Court should exercise its discretion and deny Wilson's application for relief due to non statutory factors. Wilson's disciplinary file shows a discharge from employment in 2007. The file indicates that he admitted to "leaving the site for personal reasons without clocking out or without prior authorization." The file goes on to allege the following:

"This (leaving work for personal reasons) included repeated events and an excessive amount of time. You also falsified your time records by not properly accounting for your unauthorized time away from the site. Additionally, during the investigation, you provided false statements and/or omitted pertinent information to the investigator."

### E. Victor Phillip

Victor Phillip began his employment at Boeing in 1986. His employment history is summarized as follows:

1986 - 1987 - pattern making tooling
1987 - 1988 - janitor
1988 - 1996 - pattern making tooler, janitor
1996 - 2011 -composite fabricator

Philip also signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.

Aside from the specific arguments about each individual vis-à-vis the merits of the application of 3607, there is a bigger question that the government recognizes that it needs to answer. That question is why does the government care? The reason is this: Special Probation does not simply allow a defendant who successfully completes a term of probation to have the proceedings against him dismissed without the entry of a judgment of conviction. It prevents future employers of these employees (other than The Boeing Company) from having any notice that these defendants participated in the use and abuse of prescription drugs while participating in the manufacture of sensitive equipment. Given that these defendants participated in and contributed to an open air drug market-type environment while manufacturing military aircraft actively used in combat, rescue and other operations around the world, the government respectfully requests that the Court ensure that notice of these crimes is available to any employer who does due diligence. Such notice does not prevent employers from hiring the defendants, but it does allow them to make an informed decision about whether to do so. This is particularly true here, where the offenses committed by the defendants are not mere possessory offenses; the offenses endangered the lives of our men and women who serve in the United States military.

For the reasons stated above, the government respectfully requests that the Court deny the defendants' motions for Section 3607 relief.

Respectfully yours,

ZANE DAVID MEMEGER
United States Attorney


_____/s/_____
FAITHE MOORE TAYLOR
ASHLEY K. LUNKENHEIMER
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that a copy of the GOVERNMENT'S MEMORANDUM IN

OPPOSITION TO DEFENDANTS' MOTIONS FOR SPECIAL PROBATION PURSUANT TO

TITLE 18, UNITED STATES CODE, SECTION 3607 has been filed electronically on the

Electronic Case Filing system and is available for viewing and downloading from the ECF

system, and/or was served by electronic mail on the following defense counsel:

Kai Scott, Esq.
Counsel for James Swan

Stephen Molineaux, Esq.
Counsel for Andy Duris

Thomas Dreyer, Esq.
Counsel for Michael Patterson

Peter Scuderi, Esq.
Counsel for Victor Phillip

Paul Messing, Esq.
Counsel for William Wallace Wilson

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date:  July 10, 2012